UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| CHARLES POWELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No: 1-16-cv-159-CHS |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security Administration, | ) ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

I. Introduction

Plaintiff seeks supplemental security income under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381 et seq. The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Sixth Circuit [Doc. 16]. Pending before the Court are Plaintiff's Motion for Summary Judgment [Doc. 13] and Defendant's Motion for Summary Judgment [Doc. 17].

For the reasons stated herein, the Court will **REVERSE** the Commissioner's decision and **REMAND** for further proceedings consistent with this opinion. Accordingly, the Court **GRANTS** Plaintiff's Motion [Doc. 13] as stated herein and **DENIES** Defendant's Motion [Doc. 17].

II. Background

    A. Procedural History

On July 13, 2012, Plaintiff protectively filed for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381 et seq., with an alleged onset date of November 18, 2011 (Tr. 167-172). Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3),

provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration ("SSA"). Plaintiff's claims were denied initially and upon reconsideration (Tr. 75, 87). On October 3, 2014, following a hearing held on July 25, 2014, administrative law judge ("ALJ"), Henry Kramzyk, found that Plaintiff was not under a "disability" as defined in the Act (Tr. 9-20).2 Plaintiff had sought disability due to illiteracy, IQ score of 69, depression, anxiety, anti-social disorder, and that he met the requirements of Listing 12.05C (Tr. 232-233). On March 22, 2016, the Appeals Council denied Plaintiff's request for review (Tr. 1-4). Thus, Plaintiff exhausted his administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner subject to judicial review pursuant to 42 U.S.C. § 405(g).

  B. <u>Relevant Facts</u>

*Plaintiff's Age, Education, and Past Work Experience*

At the time of the hearing before the ALJ on October 3, 2014, Plaintiff was 53 years old. He was 50 years old at the time of his alleged onset of disability on November 18, 2011, and he has past relevant work as a dish washer/kitchen helper. He completed the eighth grade, having repeated the third and seventh grade twice (Tr. 298).

*Plaintiff's Testimony and Medical History*

On November 15, 2012, Plaintiff was evaluated as having a full scale IQ of 69, which is considered "extremely low" intellectual functioning (Tr. 301). In his disability report, Plaintiff alleged disability based on nerves, depression, and illiteracy (Tr. 185). Plaintiff's girlfriend helped Plaintiff fill out his function report because he cannot read or write beyond a very basic level. Plaintiff reported he lived with his mother, watched television, fed and petted his pets, performed personal care without assistance when reminded by his mother to do so, and prepared sandwiches and frozen dinners (Tr. 191-93, 195). He also wrote that he performed yard work when "Mom tells

me to," and if he doesn't, he "get[s] whipped" (Tr. 194). He also reported he went outside daily, went shopping for groceries once a month, and he checked the box on the activities form indicating that he could pay his bills and count change; however, he reported he could not handle a savings account and use a checkbook "cause I can't read or wright [sic]" (Tr. 193-94). It is unclear what bills he paid since he lived with his mother and later his girlfriend. There is no evidence in the record that he has ever lived independently. For Plaintiff, paying bills may simply mean that he paid for groceries on his monthly shopping trip. It could mean something else. The record is undeveloped on this subject.

Plaintiff reported he did not spend time with others and did not get along with authority figures. He checked the box that he had no problem getting along with family, friends, and neighbors, and that he had never been fired due to inability to get along with others (Tr. 195-97). Plaintiff also reported during his November 15, 2012, evaluation that, in his last job as a dishwasher, he "cussed out" his boss (Tr. 300). On the activities form, Plaintiff reported he went to church twice per week (Tr. 195). He reported also that he could not finish what he started, or follow instructions or pay attention. (Tr. 196-97). Plaintiff thought he handled stress "very badly," but handled changes in routine "very well" (Tr. 197).

In his August 27, 2012, work history report, Plaintiff wrote that he worked labor and lawn maintenance jobs from 1990 to 1996, washed dishes from 1998 to 2000, and engaged in carpentry work and building clean-up in 2000 and 2001 (Tr. 205). On November 21, 2012, Jenaan Khaleeli, Psy.D., a state agency psychological consultant, reviewed Plaintiff's records and opined that Plaintiff had no episodes of decompensation; mild limitations in activities of daily living; moderate limitations in social functioning and concentration, persistence, or pace; and moderate limitations in the ability to interact with the public, the ability to accept instructions and criticism, the ability to

get along with others and to engage in socially appropriate behaviors (Tr. 80-81). Upon reconsideration, Amin Azimi, Ed.D., reviewed Plaintiff's records and opined on February 13, 2013, that Plaintiff had no episodes of decompensation and moderate limitations in daily living, social functioning, and concentration, persistence, or pace (Tr. 92-93). Dr. Azimi found Plaintiff had severe impairments of anxiety and antisocial personality disorder, unspecific organic mental disorder, and a substance addiction disorder (Tr. 91).

Medical records predating Plaintiff's July 13, 2012, application date show that he received mental health treatment from October 2009 to October 2010 when he was incarcerated (Tr. 237-291). Plaintiff told providers that he had been in and out of prison since 1984 (Tr. 237). He said that he had previously received disability benefits but that they were terminated when he went to jail in 1988 (Tr. 247). Plaintiff reported working part-time in 2010 (Tr. 251). In May and July 2010, he reported doing odd jobs for people with whom he went to church (Tr. 267, 269, 284). He also reported that he took care of his mother and did things around the house (Tr. 267).

Evidence after Plaintiff's application date shows that he saw Dee Langford, Ed.D., for a psychological consultative examination on November 15, 2012 (Tr. 297-303). Plaintiff reported that he had received disability benefits for about a year beginning in 1987 until he was incarcerated (Tr. 297). Plaintiff told the doctor that he completed the eighth grade and had difficulties in school with truancy and fighting (Tr. 298). He said that he repeated grades three and seven, but he denied attending special education classes (Tr. 298). Plaintiff listed legal charges of driving on a revoked license, aggravated assault on police officers, assault with attempted murder, and possession of stolen property (Tr. 299).

Plaintiff told Dr. Langford that he received mental health treatment before his incarceration, before his insurance ran out when he was locked up. (Tr. 299). The ALJ noted in his decision that

7

Plaintiff had failed to fill out the paperwork to keep his state sponsored insurance. Plaintiff was living with his mother in a trailer (Tr. 298). He reported he had not had alcohol in about nine years. (Tr. 298). He reported homicidal and suicidal ideations with no intent or plans (Tr. 299). Plaintiff denied hallucinations, and the doctor noted that he did not appear to experience delusional thinking (Tr. 299). Plaintiff described his mood as sad, anxious, and depressed (Tr. 299). He reported daily activities of watching television, cleaning around the house doing "odds and ends," walking to the park, going to the store, cooking, washing dishes, sweeping, doing laundry, mowing the grass, and going to church (Tr. 300). He said that he could manage his medications and his finances with little difficulty (Tr. 300), "but he might need supervision" with his finances. (Tr. 303). Plaintiff lost his driver's license due to driving infractions (Tr. 300). Dr. Langford stated, "[h]e has seemingly exhibited anti-social behaviors for years, causing him to have been incarcerated at least 14 times. He appears to have had a sporadic work history, interspersed with these incarcerations, mostly related to his alcohol use" (Tr. 303).

Upon mental status examination, Dr. Langford found Plaintiff was oriented and cooperative and displayed good eye contact (Tr. 299-300). He had normal speech and flat mood (Tr. 299-300). Plaintiff's responses were coherent and easy to understand, although also simplistic and concrete (Tr. 299). Plaintiff's thought processes were clear and logical (Tr. 299). He recalled his date of birth and social security number and knew how many months were in a year, but not how many weeks in a year (Tr. 299). Plaintiff could follow spoken, but not written, directions (Tr. 299). He could name common objects, but he showed poor use of basic vocabulary and poor basic math skills (Tr. 299).

Testing revealed that Plaintiff obtained a full-scale IQ score of 69 on the Wechsler Adult Intelligence Scale, 4th edition (Tr. 301) . His reasoning abilities on verbal tasks were generally in

the extremely low range, while his nonverbal reasoning abilities were in the low average range (Tr. 302). Dr. Langford stated the evidence showed that Plaintiff fell into the extremely low range of intellectual functioning and that he had mild problems with short-term memory and moderate concentration problems (Tr. 299-300). The doctor found moderate impairment in long-term memory (Tr. 300, 302). Dr. Langford wrote that Plaintiff had a moderate impairment in social relating and a marked impairment in his ability to adapt to change (Tr. 303). Diagnoses included generalized anxiety disorder, dysthymic disorder, and a rule-out diagnosis of mild mental retardation (Tr. 303). She assigned Plaintiff a GAF score of 45[1] (Tr. 303).

Plaintiff started receiving mental health treatment on July 15, 2013, when he presented for a psychological evaluation with Sheila Beard, a licensed professional counselor (Tr. 387-399). Plaintiff reported that he had anger issues and had taken medication for his depression and mood swings in the past (Tr. 387). He told Ms. Beard that he was sent to prison in 2005 for charges of driving under the influence and aggravated assault (Tr. 387). He was jailed again in 2010 for driving on a revoked license and parole violation (Tr. 387). He spent 22 months in prison, and was released in June 2012 (Tr. 387). Plaintiff reported that he had an eighth grade education, could read at a third grade level, and had a suicide attempt in 1981 (Tr. 388).

Upon examination, Ms. Beard observed that Plaintiff's appearance and behavior were appropriate, and he had no orientation problems (Tr. 394). Plaintiff's thought process was organized (Tr. 395). His speech was soft and slow, and he had sad and anxious affect (Tr. 394). Plaintiff's mood was dysthymic, and he endorsed hallucinations, worthlessness, and hopelessness

---

[1] GAF is Global Assessment of Functioning. A score of between 41 and 50 indicates:
    **Serious symptoms** (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting)
    **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).
https://www.albany.edu/counseling_center/docs/GAF.pdf (March 4, 2018).

(Tr. 395). Plaintiff endorsed suicidal ideation, but denied intent or plan (Tr. 395, 397). Ms. Beard noted that Plaintiff was neat and clean in appearance and appeared somewhat anxious (Tr. 395). She wrote that Plaintiff denied being physically aggressive with anyone since his release from jail (Tr. 395). Plaintiff reported sometimes hearing voices and seeing "human distorted looking figures. Ms. Beard diagnosed major depressive disorder (Tr. 397-98).

At his medication services appointment the next day, Plaintiff reported that he was depressed, agitated, irritable, and more angry (Tr. 376). He denied violent behaviors (Tr. 376). Plaintiff reported that he heard auditory hallucinations, but they were mostly mumbling and he could not make out what they were saying (Tr. 376). Plaintiff said that he and his girlfriend tried to get out and camp and fish (Tr. 376). He said that he worked "here and there" doing construction work and yard work, or whatever he could pick up (Tr. 377).

Examination on July 16, 2013, revealed that Plaintiff had normal thought processes, judgment, insight, orientation, and mood and affect (Tr. 378-79). He was not homicidal, suicidal, or violent (Tr. 379). Jennifer Miller, a nurse, prescribed amitriptyline (Tr. 381). Notes indicate that Plaintiff was scheduled to attend group therapy on July 22, 2013, but he did not show up for the appointment (Tr. 373). Plaintiff attended a case management appointment on July 29, 2013, but he did not attend his group therapy appointment scheduled for the same day (Tr. 365-67, 370). At an August 12, 2013, case management appointment, Plaintiff reported that he had improved sleep and decreased depression with his medication, and he denied experiencing any symptoms since starting medication (Tr. 363). Likewise, at his appointment the next day with Ms. Miller, Plaintiff reported that he was doing "pretty good" on his medicine and was less cranky (Tr. 357). He denied suicidal or homicidal ideation and hallucinations (Tr. 357). Examination revealed that he had normal speech, thought processes, judgment, insight, orientation, mood, and affect (Tr. 359). Notes stated

that he had improved mood, was euthymic, and was not irritable (Tr. 360).

Plaintiff did not show for his August 19, 2013, group psychotherapy appointment (Tr. 356). Plaintiff reported increased anxiety on August 26, 2013, due to conflict with his mother and sibling, and he said that he and his girlfriend would be moving soon (Tr. 354). At his September 9, 2013, case management appointment, Plaintiff again reported high anxiety due to family conflict (Tr. 352). However, he said his medications continued to help, and he denied any symptoms of dangerousness (Tr. 352). Plaintiff did not attend two scheduled group psychotherapy appointments in September 2013 (Tr. 350-51). Plaintiff was not home for his scheduled case management visit on September 23, 2013, so Sandra Austin, B.S., spoke with his girlfriend (Tr. 348). His girlfriend said that Plaintiff was resistant to moving because he thought it would disrupt his disability case (Tr. 348). Plaintiff reported that his mood had been stable at his October 7, 2013, case management appointment (Tr. 346). On October 21, 2013, he reported anxiety issues triggered by back pain, but he said that he was doing fine otherwise (Tr. 344). Throughout these appointments, one stated goal has been to reduce the occurrence of suicidal ideation.

Plaintiff had a medication services appointment on November 5, 2013, when he reported that his mood was still up and down, but he said his mood had been pretty good lately (Tr. 337). Plaintiff reported that his medication helped him to be more level, and he did not want to change medications (Tr. 337). Plaintiff denied homicidal ideation, hallucinations, paranoia, and delusions (Tr. 337). Although he said he felt suicidal at times, Plaintiff denied intent or plan (Tr. 337-38). He was clean, neat, and cooperative with no agitation or retardation (Tr. 339). Other than a tearful and depressed mood related to his dog's death, Plaintiff's other findings were normal (Tr. 339). Plaintiff's diagnosis and medication were unchanged (Tr. 341-42).

On November 14, 2013, Plaintiff reported during his case management appointment that he

continued to do well with stable mood (Tr. 335). He and his girlfriend had been spending time up on the mountain and in the woods (Tr. 335). Plaintiff missed his November 27, 2013, case management appointment (Tr. 333). Two days later, Plaintiff's girlfriend told Ms. Austin that they had forgotten about the appointment and were in Chattanooga at one of their favorite restaurants (Tr. 331). She reported that Plaintiff's mood had been stable with no increased symptoms (Tr. 331). Plaintiff again missed case management appointments in December 2013 and January 2014 (Tr. 327, 329).

On January 13, 2014, Plaintiff told Ms. Austin that he had stable moods and no suicidal ideation (Tr. 325). At his medication services appointment on January 27, 2014, Plaintiff reported he was doing "pretty good," and he rated his mood at a 9 out of 10 with 10 being great (Tr. 317). Plaintiff denied suicidal and homicidal ideations, hallucinations, paranoia, and delusions (Tr. 317). He denied medication side effects (Tr. 317). Plaintiff's mood was euthymic, made good eye contact, smiled, and was cooperative, calm, clean, and neat (Tr. 318-19). He displayed no agitation or retardation (Tr. 318). Ms. Miller noted normal speech, thought processes, associations, judgment, insight, orientation, mood, and affect (Tr. 319). She wrote that Plaintiff had improved, and his diagnosis and medication were unchanged (Tr. 320-21). Robyn Argo, B.S., attempted to contact Plaintiff three times in May 2014 to schedule a case management appointment, but Plaintiff did not answer or return her calls (Tr. 309-314). Plaintiff cancelled his July 14, 2014, medication services appointment (Tr. 307).

At his administrative hearing held on July 25, 2014, Plaintiff testified that he lived with his girlfriend, who cleaned the house (Tr. 30, 40-41). He performed personal care independently, looked after his dog with his girlfriend, shopped, watched movies, went fishing

12

once or twice per week, and collected old model cars (Tr. 41-43, 45). He also liked to go four wheeling, and he went as recently as the Sunday before the hearing (Tr. 42). Plaintiff testified that he never did any yard work (Tr. 44). He testified that he completed the 7th grade, and he could write his name and read a little bit (Tr. 31). He worked for a year in 1999 as a dishwasher (Tr. 32-33). He testified that he had never lived alone, and he had someone else fill out his social security paperwork (Tr. 46-47). He had been incarcerated for assault, but he said that it had been a year-and-a-half to two years since he was last incarcerated (Tr. 38, 47). Plaintiff testified that depression, nerves, anger, and inability to read and write prevented him from working (Tr. 34-35). Plaintiff last saw his psychiatrist six months before the hearing, and he was not undergoing current treatment (Tr. 38-39). Since July 2012, Plaintiff had not been to the emergency room or been hospitalized for depression or anger (Tr. 45-46). He had mental health care treatment through a state program, but he did not complete the paperwork to continue the treatment after it expired (Tr. 51).

At the hearing, the ALJ asked the vocational expert a hypothetical question that assumed an individual of Plaintiff's age, education, training, and work experience who could perform work at all exertional levels except never climb ladders, ropes or scaffolds and cannot read or write; can remember and carry out simple instructions; can concentrate for two hours at a time for eight hours a day; can have only occasional co-worker contact and supervision; can have a set routine; can maintain regular attendance and be punctual within customary allowances; and can perform activities within a schedule – although no fast paced work is required (Tr. 55). In response, the vocational expert testified that the individual could perform Plaintiff's past relevant work as a dishwasher; an unskilled, SVP 23, and medium job that Plaintiff performed as a light

13

job, as it was actually and generally performed (Tr. 56). In addition, Plaintiff could perform other jobs existing in the national economy, including as a janitor (medium; SVP 2; unskilled; over 1,000,000 positions nationally and 15,000 in Tennessee); landscape laborer (heavy; SVP 2; unskilled; 250,000 positions nationally and 1,500 in Tennessee); and commercial cleaner (heavy; SVP 2; unskilled; 2,140,000 nationally and 15,000 in Tennessee) (Tr. 56). The vocational expert stated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") (Tr. 57).

### *Additional Evidence*

Plaintiff has attached to his memorandum in support of summary judgment, a Full DIB Review Sheet for the Plaintiff, a computer generated document from the Social Security Administration, which shows that Plaintiff was awarded supplemental security income benefits based on an application date of August 2, 1984. The diagnosis code was "mental retardation." (Doc. 13-2, at p. 3). There is no dispute that Plaintiff's benefits were discontinued when he went to prison in 1989. There is also no dispute that this information was not before ALJ Henry Kramzyk when he made his decision denying disability. The file for this 1984 claim no longer exists because the Social Security Administration retains files in which a claim is favorably decided for only five years (non-disability) or ten years (disability) after the last payment is made. HALLEX I-2-1-10(D). *See* Commissioner's Memorandum at 19, Doc. 18.

### *The ALJ's Findings*

After considering the entire record, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since July 13, 2012, the application date (20 C.F.R. § 416.971 *et seq.*)

2. The claimant has the following severe impairments: depression; mild intellectual disability (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes or scaffolds; can do work that does not require reading or writing; able to understand, remember and carry out short, simple, repetitive instructions; able to sustain attention/concentration for 2-hour periods at a time and for 8 hours in the workday on short, simple, repetitive instructions; can use judgment in making work decisions related short, simple, repetitive instructions; requires an occupation with only occasional co-worker contact and supervision; requires an occupation with set routine and procedures, and few changes during the workday; requires an occupation with no contact with the public; no fast paced production work; can maintain regular attendance and be punctual within customary tolerances; and can perform activities within a schedule.

5. The claimant is capable of performing past relevant work as a dishwasher/kitchen helper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6. The claimant was not under a disability, as defined in the Social Security Act, since July 13, 2012, the date the application was filed (20 CFR 416.920(f)).

(Tr. 12, 14, 18, 19).

III. Analysis

A. Standard of Review

To establish disability under the Social Security Act, a claimant must establish he is unable to engage in any substantial gainful activity due to the existence of a medically

determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he is not disabled; (2) if the claimant does not have a severe impairment he is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he is disabled; (4) if the claimant is capable of returning to work he has done in the past he is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a *prima facie* case that he cannot return to her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he can perform considering her age, education and work experience. *Richardson v. Sec'y, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389 (1971); *Landsaw v. Sec'y, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence

and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.*, 790 F.2d 450 n.4 (6th Cir. 1986).

The court may consider any evidence in the record, regardless of whether the ALJ cited it. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). However, for purposes of substantial evidence review, the court may not consider any evidence that was not before the ALJ. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is not obligated to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-cv-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,'" *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

B. Discussion

Plaintiff presents two issues for review:

(1) Whether the ALJ erred in finding that claimant does not meet or equal the requirements of Listing 12.05C., and

(2) Whether the case should be remanded under Sentence Six of 42 U.S.C. §405(g) for consideration of the Full DIB Review Sheet query date 7/20/2010 showing approval for SSI benefits 8/2/1984 due to "Mental Retardation" two months after Powell turned age 23 (attached hereto as "Exhibit A")

17

Plaintiff contends his impairments met or equaled 12.05C of the Listing of Impairments (Listing 12.05). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. When a claimant alleges his impairments meet or equal a listed impairment, he must present specific medical findings that satisfy *all* of the criteria of the particular listing. *See* 20 C.F.R. §§ 416.920(a)(4)(iii), (d), 416.925, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990); *Foster*, 279 F.3d at 354; *Hale v. Sec'y of Health and Human Servs.*, 816 F.2d 1078, 1082-83 (6th Cir. 1987). For reasons that follow, I conclude Plaintiff failed to prove his impairments met or equaled Listing 12.05C, and substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or equal Listing 12.05C. Listing 12.05 provides in pertinent part:

> *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \* \* \* \*
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. The court in *Hayes v. Comm'r of Social Security*, 357 Fed. App'x 672, 675 (2009) explained,

> [i]n other words, to demonstrate mental retardation, a claimant must demonstrate three factors to satisfy the diagnostic description: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations. Beyond these three factors, a claimant also must satisfy "any one of the four sets of criteria" in Listing § 12.05. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A); *see also Foster v. Halter*, 279 F.3d 348, 354 (6th Cir.2001) ("[A] claimant will meet

the listing for mental retardation only if the [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria[.]") (second alteration in original) (internal quotations marks omitted).

*See also West v. Comm'r of Social Sec.*, 240 Fed. App'x 692, 697-98 (6th Cir. 2007) (same).

Plaintiff alleges that his impairments met subsection C of Listing 12.05. Plaintiff, therefore, had to show he had significantly subaverage general intellectual functioning with deficits in adaptive functioning manifesting before age twenty-two and that he has a valid IQ score of 70 or below *and* another severe impairment affecting his ability to work. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00A, 12.05; *Foster*, 279 F.3d at 354-55.

The ALJ found that Plaintiff did not meet Listing 12.05C because "there is no evidence of significantly sub-average general intellectual functioning initially manifested prior to age 22. . . . Further, there is no evidence of mental incapacity, for example, that the claimant was dependent upon others for toileting, eating, dressing or bathing, nor any indication of an inability to follow directions" (Tr. 12).

Plaintiff asserts that his illiteracy, his completion of no more than seventh grade, and his repeating third and seventh grade are evidence of an intellectual disability before age 22. However, as the Commissioner notes, Plaintiff denied being in special education classes and admitted he had a problem with truancy, which could have contributed to his reading problems. The Sixth Circuit "has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x. 672, 677 (6th Cir. 2009). The Court cannot conclude that the ALJ erred, based on the evidence before him, in finding that Plaintiff had not

proved he had sub-average general intellectual functioning which manifested itself prior to age twenty-two.

Plaintiff also asserts that the ALJ erred by not assembling a full DIB Review Sheet of his prior Social Security Disability applications and awards. Had the ALJ done so, argues Plaintiff, the ALJ would have known that in 1984, just one year and two months after Plaintiff turned 22 years old, Plaintiff was awarded disability benefits on the basis of mental retardation.[2] Plaintiff argues that this award on the basis of mental retardation would have been strong evidence of an subaverage intellectual functioning prior to age twenty-two. Plaintiff further argues that the Commissioner did not follow its own procedures when the Commissioner failed to include evidence of the 1984 disability award based on mental retardation. *See* HALLEX I-2-1-13. HALLEX I-2-1-13 provides in relevant part:

> **A. General**
>
> In some cases, it will be necessary for the administrative law judge (ALJ) to review a prior claim(s) file in order to fully adjudicate a current claim. Hearing office (HO) staff will determine whether the claimant filed a previous application by checking the Master Beneficiary Record for title II claims and the Supplemental Security Income Detailed query for title XVI claims. If there was a previous filing, HO staff will add a message in eView and a remark in the Case Processing and Management System.
>
> HO staff will initially evaluate whether a prior claim(s) file is required, as set forth in B.1. below. If the prior claim(s) file is not required, HO staff will consult with the ALJ as to whether he or she needs the prior claim(s) file in order to fully evaluate the issue(s).
>
> \*      \*      \*
>
> **2. Considering Evidence in Prior Claim(s) May Be Necessary**

---

[2] In 2013, the term "mental retardation" was replaced with the term, "intellectual disability." *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01 (Aug. 1, 2013).

> HO staff must consult with an ALJ about obtaining a prior claim(s) file when it may be necessary for a full adjudication of the issues before the ALJ. An ALJ will generally find that evidence in a prior claim(s) file is necessary for a full adjudication of the issues when the ALJ determines:
> • *There is a need to establish a longitudinal medical, educational, or vocational history; or*
> • *The impairment is of a nature that evidence from a prior claim(s) file could make a difference in establishing whether disability is present in the current claim.*
>
> **NOTE:**
> ALJs should keep in mind that even when a prior claim(s) file is not required, failure to obtain and consider evidence in a prior claim(s) file may constitute a reason for remand from the Appeals Council (depending on the facts of the case).

*Id.* (emphasis added).

Plaintiff seeks a remand under Sentence Six of 42 U.S.C. § 405(g) in order to allow the Commissioner to consider Plaintiff's prior award of disability benefits for mental retardation in 1984 as new and material evidence. At this point, because it has been more than ten years since Plaintiff received his last payment for this award of benefits, the underlying file for this claim is nonexistent. The only evidence of this award that the Social Security Administration possesses, apparently, is the Full DIB Review Sheet – it is as complete as the file can be regarding this award.

The Commissioner argues that the DIB Review Sheet is not medical evidence and therefore the failure to include it in the record was not error. This award of benefits based on "mental retardation" is itself not *medical* evidence, but it is *evidence* that the Social Security Administration found, one year and two months after Plaintiff turned twenty-one years old, based on medical evidence, that Plaintiff had subaverage intellectual functioning. While this administrative finding by itself would not be helpful in calculating the Plaintiff's residual

functional capacity since the finding does not indicate Plaintiff's *degree* of intellectual disability, it is certainly germane to (though not dispositive of) the question of the *existence* of subaverage intellectual functioning prior to age twenty-two – an issue central to Listing 12.05C and the sole basis upon which the ALJ concluded Plaintiff did not meet Listing 12.05C: "there is no evidence of significantly sub-average general intellectual functioning initially manifested prior to age 22 as required by that introductory paragraph of the listing" (Tr. 120). Thus, the omission from the administrative record of the DIB Review Sheet evincing Plaintiff's 1984 award of supplemental security benefits on the basis of "mental retardation" was prejudicial to the Plaintiff.

The Court finds remand under Sentence Six is not appropriate since Plaintiff's award of benefits in 1984 for "mental retardation" is not new evidence. Rather, remand is appropriate under Sentence Four because the Commissioner did not follow its own procedures as stated in HALLEX I-2-1-13 thereby prejudicing the Plaintiff. *See Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 174 (6th Cir. 1994) ("It is clear, on the other hand, that sentence four of § 405(g) contemplates the type of remand involved in the present case—a remand after a final decision by the district court reversing the denial of benefits by the Secretary in order to correct an error by the Secretary in applying the regulations even if the rehearing to correct the error requires the taking of additional evidence.") *See also Beason v. Comm'r Soc. Sec.*, Case No. 2014 WL 4063380, at *9-10 (E.D. Tenn. Aug. 15, 2014) (Lee, J.) (remand for failure to follow requirements in HALLEX is appropriate where the claimant has been prejudiced by such failure.)

IV.  Conclusion

Having carefully reviewed the administrative record and the parties' briefs filed in support

of their respective motions, the decision of the Commissioner is **REVERSED** and **REMANDED** under Sentence Four of 24 U.S.C. § 405(g) for further proceedings consistent with this opinion. Accordingly, Plaintiff's Motion for Summary Judgment [Doc. 13] will be **GRANTED** to the extent stated herein and Defendant's Motion for Summary Judgment [Doc. 17] will be **DENIED**. Judgment shall be entered in favor of the Plaintiff.

       **ENTER.**

                                      /s/ *Christopher H. Steger*
                                      UNITED STATES MAGISTRATE JUDGE